

FILED

Apr 24 2024, 9:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Court of Appeals of Indiana

C.K.,

*Appellant-Respondent*

v.

State of Indiana,

*Appellee-Petitioner*

---

April 24, 2024

Court of Appeals Case No.
23A-JM-2671

Appeal from the Madison Circuit Court

The Honorable Stephen Koester, Judge

Trial Court Cause No.
48C02-2309-JM-173

---

**Opinion by Judge Riley**
Judges Brown and Foley concur.

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, C.K., appeals the trial court's Order, finding her in contempt of court.

We affirm.

## ISSUE

C.K. presents this court with one issue on appeal, which we restate as: Whether the trial court abused its discretion when it held C.K. in contempt of court.

## FACTS AND PROCEDURAL HISTORY

C.K. is the mother of one child, R.K. In March 2023, C.K. announced on Facebook that she was pregnant with another child and posted a picture of her "belly." (Transcript p. 14). That same month, when R.K. was approximately six months old, the Indiana Department of Child Services (DCS) got involved with the family. Family Case Manager Kimberly Rodemeyer (FCM Rodemeyer) noticed that C.K. "did have a belly," appeared pregnant, and that she mentioned her pregnancy complications to service providers. (Tr. p. 16). C.K. informed a visit supervisor that she had given birth on August 31, 2023, and showed FCM Rodemeyer a photo of a newborn.

On September 13, 2023, FCM Taylor Humphries (FCM Humphries) received a report alleging that C.K. had recently given birth to a two-month premature

baby and that her residence was dirty. A photo of a baby accompanied the report. Following up on the report, FCM Humphries went to C.K.'s residence several times where she spoke with C.K. Despite refusing to divulge the whereabouts of the baby, who C.K. now reported was born on August 26, 2023, C.K. mentioned that the baby had a heart murmur, a "stage two heart issue," a hole in the heart, asthma, and diabetes. (Tr. p. 8). After getting the name of the putative father, FCM Humphries located the alleged father, who informed her that he did "not have any proof that there [was] actually a child" and that he was "not sure that the child [was] actually his if there [was] one." (Tr. pp. 7-8). Although C.K. told FCM Humphries that the child was in the NICU, none of the area hospitals had a child by the name or birthdate provided by C.K. After making significant efforts, FCM Humphries could not locate a birth certificate for the baby. A site visit at C.K.'s residence revealed that C.K. did not have any formula or diapers in her home. At one point, C.K. informed FCM Humphries that the baby had passed away on September 18, 2023, and that she was going to have the child cremated. However, C.K. did not provide a death certificate and FCM Humphries was unable to obtain such record. FCM Humphries was unable to ascertain whether C.K. had given birth to a child, and if so, whether the child was alive.

On September 22, 2023, DCS filed a verified motion pursuant to Indiana Code section 31-33-8-7 to compel C.K. to make the child available for an interview and otherwise cooperate with DCS. During the trial court's hearing on September 26, 2023, C.K. appeared *pro se* and informed the court that the baby

was at Riley Children's Hospital (Riley) but had passed away on September 18, 2023. At the close of the hearing, the trial court granted DCS's motion, ordered DCS to contact Riley, prepare a report, and share it with law enforcement.

[7] After the hearing, DCS contacted Riley and was again informed that there was no child there with the name and date of birth provided by C.K. Riley also confirmed that there had not been any child fatalities during the relevant period. Law enforcement had no information about C.K.'s baby. Although C.K. had signed a release of information for DCS, she had left the doctor's and hospital names blank. When questioned about the blank spaces, C.K. said that she had seen several doctors at the Women's Hospital. She refused to give DCS any other information. When confronted with a possible suspension of her visitation rights with R.K., C.K. admitted that "there wasn't a kid" but again refused to clarify. (Tr. p. 29). DCS was still unable to confirm the existence of any baby.

[8] On September 29, 2023, DCS filed a second verified motion to compel, with various attachments, again requesting C.K. to make the child available for an interview, sign a release of information, and cooperate with DCS. The attachments featured several of C.K.'s Facebook posts which announced her pregnancy with photos and included a gender reveal, complaints about Braxton-Hicks contractions, and mentions of the birth of a baby. The attachments further included text messages and pictures of a newborn. DCS also filed a verified information for a rule to show cause, claiming that C.K. had violated the trial court's order instructing her to disclose her child's

whereabouts. On October 2, 2023, the trial court conducted another hearing at which C.K. appeared *pro se*. During the proceedings, she testified that "there's no baby[,]" and she admitted to having previously said that there was a baby because she was scared. When the trial court inquired about all the Facebook posts about her pregnancy and the baby, she insisted that she had not been on Facebook "in a while" and that others had been posting about her. (Tr. p. 32). She admitted that she had told people that she was pregnant because at one point she was indeed pregnant. At the close of the evidence, the trial court found C.K. in contempt of court for "providing false information to [the c]ourt and the Department under oath." (Appellant's App. Vol. II, p. 73). C.K. was taken into custody.

[9] On October 11, 2023, the trial court held a sanctions hearing, where C.K. was represented by counsel. FCM Rodemeyer testified that on October 5, 2023, she had received a call from a woman named Nicole. Nicole had informed FCM Rodemeyer that she had been contacted by three different men, all claiming that C.K. had told them that Nicole had C.K.'s baby. Nicole then contacted C.K., who told her that there was a baby but that she would not let anyone know the whereabouts. Another woman had also contacted FCM Rodemeyer and told her that C.K. had used pictures of this woman's child to pass off as her own and to send to the alleged father. A Facebook post suggested that C.K. had previously used pictures of her sister's baby, claiming the baby as her own. During this hearing, DCS was still unable to confirm whether C.K. had given birth and, if she had, where the baby was. Evidence admitted at the hearing

indicated that C.K. suffered from bipolar disorder and schizophrenia for which she did not take medication. Testifying in her own defense, C.K. admitted that "there's no baby" and that she only had claimed one existed because she had felt pressured by DCS's questions. (Tr. p. 31). C.K. also confirmed that she had told DCS that the baby had passed away and conceded that she had informed the court that there had been a baby. At the end of the hearing, the trial court imposed a ninety-day period of incarceration as a sanction for C.K.'s contempt and concluded,

> I'm not sure what we accomplished today other than more confus[ion] and just the fact that what the Department has had to expend as far as money and time to try to sort this out is bad enough but then you came in front of the [c]ourt and egregiously lied about what's going on. Then after called out on the lie you double down with more lies and I think that there's been more lies here today. And I still don't know what the truth is. I'm not sure you know what the truth is because you tell so many lies that it just –

> We're done talking. This is as egregious of a contempt hearing that I've ever [seen] since in almost thirty years in this business. I can give you up to a hundred and eighty days and I'm quite certain that I'm not sure why I'm not giving you a hundred and eighty days. Because I've never seen anything this egregious. I think the only thing that is in your favor is that you have some mental health problems that you need to address. But what you're going to learn today is that you don't raise your hand under oath and lie and then double down on that lie and then come for the sanction for that lie and lie some more. This is three times that you've flat out lied to me. So you're going to serve ninety days in jail.

(Tr. p. 59).

C.K. now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

C.K. contends that the trial court abused its discretion by finding her in contempt of court. As a threshold matter, we first address the State's argument that C.K.'s appeal is moot, as C.K. has already served her entire contempt sanction. While we agree with the State that "the controversy at issue" has been "settled," so "the court can give" C.K. "no effective relief," we do recognize a public interest exception in the cause before us. *T.W. v. St. Vincent Hosp. and Health Care Ctr., Inc.*, 121 N.E.3d 1039, 1042 (Ind. Ct. App. 2019). Contrary to C.K.'s argument, the trial court did not find her in contempt because she failed to produce a newborn for an interview with DCS, the court found C.K. in contempt because she provided false information to the court and DCS while she was under oath. A witness who lies in court is an issue that can and will occur again, and which must be discouraged to retain trust in the judicial system. As such, the situation before us is of public importance and we will address the trial court's contempt finding on its merits. *See E.F. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 188 N.E.3d 464, 466 (Ind. 2022) ("Indiana recognizes a public interest exception to the mootness doctrine, which may be invoked when the issue involves a question of great public importance which is likely to recur.")

[12]  Turning to the trial court's finding of contempt, we note that "[i]t is soundly within the discretion of the trial court to determine whether a party is in contempt, and we review the judgment under an abuse of discretion standard." *Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016). "We will reverse a trial court's finding of contempt only if there is no evidence or inference therefrom to support the finding." *Id.* The trial court has the inherent power to "maintain [ ] its dignity, secur[e] obedience to its process and rules, rebuk[e] interference with the conduct of business, and punish[ ] unseemly behavior." *Id.*

[13]  Contempt of court generally involves disobedience of a court or court order that "undermines the court's authority, justice, and dignity." *In re A.S.*, 9 N.E.3d 129, 131 (Ind. 2014). There are two kinds of contempt: direct contempt and indirect contempt. *Id.* Direct contempt, which is at issue in this case, "involves actions occurring near the court, interfering with the business of the court, of which the judge has personal knowledge." *Tunis v. State*, 129 N.E.3d 258, 262 (Ind. Ct. App. 2019). By lying in court while under oath, C.K. committed direct criminal contempt, which is governed by Indiana Code section 34-47-2-2 and which provides that "[e]very person who [] while upon the witness stand, is purposely so demeaning as to retard or disturb the proceedings of the court; is considered guilty of direct contempt of court." Though specified by statute, the power of courts to summarily punish for direct criminal contempt rests upon the common law and is inherent in the courts. *Hopping v. State*, 637 N.E.2d 1294, 1296 (Ind. 1994). Any act which manifests a disrespect and defiance of a court may constitute direct criminal contempt. *Id.* at 1297. Moreover, in

reviewing direct contempt proceedings, we "accept as true the statement entered of record by the lower court of the matter constituting the contempt," and "interfere with the judgment only where it clearly appears the alleged acts do not constitute contemptuous acts." *In re Caito*, 459 N.E.2d 1179, 1182 (Ind. 1984), *reh'g denied*.

[14] In *Young v. State*, 154 N.E.478, 479 (Ind. 1926), our supreme court stated that "[o]rdinarily, false swearing by a witness is held to be such an obstruction of justice as to constitute a direct contempt of court." It is not necessary that the false testimony upon which the charge of contempt is based constitute perjury. *Id*. The court held that "[o]f possible acts few are so antagonistic to the objects of judicial administration as the intentional false swearing which seeks to baffle the search for truth, without which justice is impossible. Such swearing is a flagrant insult to the dignity of the court." *Id*. The court concluded that Young, "without any regard for the oath he had taken, and without any consideration or respect for the authority, justice, or dignity of the court, gave testimony which he knew was false, and by so doing he purposely demeaned himself as to retard the proceedings of the court." Although the court held otherwise in *In re Marriage of Neiswinger*, 477 N.E.2d 257 (Ind. 1985), *Neiswinger* is distinguishable on the facts from both *Young* and the instant cause. In *Neiswinger*, our supreme court concluded that the falsity of the witness' testimony, which could only be inferred by reference to later testimony and which caused no disturbance or disruption to the proceedings, did not constitute direct contempt. *Id*. at 260.

Here, C.K. claimed to have given birth to a two-month premature baby, who had been in Riley's NICU with serious health concerns. Later, she claimed that the child had died. Indiana Code section 31-33-8-1 provides that DCS shall initiate "an appropriately thorough" assessment of every report of child abuse or neglect it receives. In the case before us, DCS had grave concerns about the wellbeing of the child and expended significant time and resources in attempting to locate the child and assess the family. After DCS filed its successive motions to compel, C.K. testified under oath. On September 26, 2023, C.K. testified under oath that the baby was at Riley, but later stated that the baby had died on September 18, 2023. On October 11, 2023, C.K. testified under oath that she did announce her pregnancy on Facebook but did not post any pictures. C.K. went back and forth in her testimony about her pregnancy, giving birth to a baby, the death of the child, and her dissemination of information about the baby. C.K.'s lies while under oath made it impossible for DCS to assess the existence and possible location of the baby and at no point during these proceedings was DCS able to confirm a birth certificate or death notice for the child. Contradicting herself egregiously under oath before the trial court, C.K. retarded or disrupted the proceedings of the court. *See* I.C. § 34-47-2-2. As there is evidence to support the trial court's finding of contempt, we do not disturb the trial court's order.

## CONCLUSION

Based on the foregoing, we hold that the trial court did not abuse its discretion by finding C.K. in contempt of court.

Affirmed.

Brown, J. and Foley, J. concur

ATTORNEY FOR APPELLANT

David W. Stone, IV
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana